## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LANDS' END, INC., SEARS HOLDINGS CORPORATION, and SEARS HOLDINGS MANAGEMENT CORPORATION, | ) ) ) ) |
| Plaintiffs, | ) ) CIVIL ACTION NO. |
| v. | ) ) JUDGE |
| EDDIE BAUER, LLC, ALAN KIRK, and SHARON ARMSTEAD, | ) ) ) |
| Defendants. | ) ) |

## COMPLAINT

Plaintiffs Lands' End, Inc. ("Lands' End"), Sears Holdings Corporation ("Sears"), and Sears Holdings Management Corporation ("SHMC") (collectively, "Plaintiffs") state for their complaint against Eddie Bauer, LLC ("Eddie Bauer"), Alan Kirk ("Kirk"), and Sharon Armstead ("Armstead") as follows:

### INTRODUCTION

1.    This action arises from an unlawful conspiracy amongst Eddie Bauer, Kirk, Armstead, and other former Lands' End employees to misappropriate the confidential, proprietary and trade secret system for Lands' End's global sourcing, logistics and design organization.

2.    Over the last four years, Lands' End, with the assistance of Kirk, who was Lands' End's Senior Vice President of Global Sourcing, Armstead, who was Lands' End's Director of Global Logistics and Customs Compliance, and the other former employees that Kirk and Eddie Bauer improperly solicited to leave Lands' End, developed a highly-successful and proprietary global sourcing system. The unique design and operation of this system has allowed Lands' End

to enjoy substantial savings in its global purchasing and manufacturing operations, which enhances Lands' End's ability to compete against competitors such as Eddie Bauer. Prior to developing its present proprietary global sourcing system, Lands' End utilized a global sourcing system that primarily relied on third parties, and which did not provide anywhere near the savings that Lands' End has been able to achieve with its proprietary internal global sourcing system.

3.      When Eddie Bauer was sold out of bankruptcy in August, 2009, it did not have an internal global sourcing operation. Instead, Eddie Bauer relied on third parties for global sourcing services. Rather than expend the significant time, effort and money needed to develop a successful internal global sourcing system and organization, as Lands' End had done, Eddie Bauer decided to shortcut the process by improperly taking and utilizing Lands' End's well-developed, proprietary global sourcing system. Accordingly, Eddie Bauer recruited Kirk while he was still an employee of Lands' End and subject to an Executive Severance Agreement.

4.      Eddie Bauer and Kirk then recruited fourteen other key employees of Lands' End's global sourcing, logistics, and design groups to leave Lands' End and join Eddie Bauer. These fourteen other employees, including Armstead, who was subject to a Mutual Confidentiality Agreement with SHMC during all relevant times, had worked with Kirk at Lands' End to develop and implement significant portions of Lands' End's global sourcing system.

5.      Eddie Bauer's goal in recruiting the core of Lands' End's global sourcing organization was to achieve in just a few months what it had taken Lands' End four years to achieve -- *i.e.*, Eddie Bauer wanted a turnkey internal global sourcing system and organization -- and it appears that Eddie Bauer did just that. As Armstead told Kirk when she accepted her new

2

employment offer, there would be no "getting up to speed" at Eddie Bauer; instead, she was going to be able to "hit the ground running."

6.  Armstead and the other employees that Eddie Bauer and Kirk poached from Lands' End brought with them Lands' End's proprietary vendor information, costing information, manuals, procedures, spreadsheets, and other information that, taken together, constitute essentially the entirety of Lands' End's proprietary global sourcing system.  For example, Armstead used her Lands' email account to send the following documents to her own private AOL email account prior to resigning from Lands' End:

a.  Rate File for Ocean Carriers Effective 5/1/10, containing detailed new shipping rates negotiated by Sears/Lands' End;

b.  Air Freight Pricing Rates for Asia for Second Quarter 2010 from Expeditors International, and comparing with rates negotiated with other carriers;

c.  Objectives for Logistics 2010 – blue print for Lands' End's Logistics department setting forth specific goals and Corporate Strategy-Strategy Initiatives;

d.  Master Data 2008 Analysis for Ocean and Dray, containing hundreds of pages of specific invoice shipping rates and data;

e.  Terms of Pricing on Lands' End's First Sale Program Agreement;

f.  Sears Ocean Contract 5-01-08 to 4-30-09 Sail Schedules;

g.  Information on pending Lands' End sourcing and logistics issues (as of May 11, 2010) on classification of apparel goods;

h.  Sears RFP for International Freight Forwarding, laying out key terms of contract and bid instructions;

i.  Sears Ocean Contract Discrepancy Info - Land Details, containing information on volume of shipments;

j.  Updated information on Sears shipping contract language; and

k.  10+2 Importer Security Filing – Important Vendor Logistics Announcement.

3

After sending these documents to her private email account, Armstead deleted the "sent" emails from her Lands' End email account and from Lands' End's computer system in an attempt to hide her improper activities.

7.     Eddie Bauer's wholesale taking of Lands' End proprietary system is obvious from a comparison of the information and documents that Eddie Bauer is using in its global sourcing system and the corresponding information and documents that Lands' End uses in its system. The Eddie Bauer documents that Plaintiffs have thus far been able to review, which Eddie Bauer made publicly available on the Internet for a period of time, are almost word-for-word copies of Lands' End's corresponding documents, including typos.   Moreover, the electronic metadata embedded within certain of Eddie Bauer's publicly available documents confirm that they were authored by Lands' End employees before Eddie Bauer began its campaign to pirate away Lands' End's key global sourcing employees.

8.     Eddie Bauer's, Kirk's and Armstead's wrongful conduct has resulted in: a mass misappropriation of Lands' End's trade secrets and confidential information (Count I); Eddie Bauer, Kirk and Armstead conspiring with one another and other former Lands' End employees to misappropriate Lands' End's trade secrets and confidential information, and to breach their fiduciary duties (Count II); Kirk's breach of his written contract with Sears and its Affiliates, including Lands' End and SHMC (Count III); Armstead's breach of her written contract with SHMC and its affiliates, including Sears and Lands' End (Count IV); Kirk's breach of his fiduciary duties and duty of loyalty (Count V); Armstead's breach of her fiduciary duties and duty of loyalty (Count VI); Eddie Bauer's knowing interference with, and inducement of, breaches of fiduciary duty and duty of loyalty by other former employees (Count VII); Eddie Bauer's knowing and intentional tortious interference with Kirk's and Armstead's respective

4

contracts with Plaintiffs (Count VIII); Eddie Bauer's and Kirk's unlawful systematic employee pirating (Count IX); violation of the federal Computer Fraud and Abuse Act (Count X); unjust enrichment (Count XI); and common law unfair competition (Count XII).

## THE PARTIES

9.     Lands' End is a Delaware corporation, with its principal place of business located at One Lands' End Lane, Dodgeville, Wisconsin 53595, and is a citizen of the State of Wisconsin for diversity jurisdiction purposes.

10.     Sears is a Delaware corporation, with its principal place of business located in this District, at 3333 Beverly Road, Hoffman Estates, Illinois 60179, and is a citizen of the State of Illinois for diversity jurisdiction purposes.

11.     SHMC is a Delaware corporation, with its principal place of business located in this District, at 3333 Beverly Road, Hoffman Estates, Illinois 60179, and is a citizen of the State of Illinois for diversity jurisdiction purposes.  SHMC manages, *inter alia*, Sears retail operations in the United States.

12.     Defendant Eddie Bauer, whose headquarters are in Bellevue, Washington, is a limited liability company whose sole member is Eddie Bauer Parent LLC.  Eddie Bauer Parent LLC has a principal place of business located at One Embarcadero Center, Suite 3900, San Francisco, California 94111.  Eddie Bauer Parent LLC's sole member is, on information and belief, Golden Gate Capital Management II, L.L.C., whose principal place of business is the same address, One Embarcadero Center, 39th Floor, San Francisco, California 94111.  On information and belief, Golden Gate Capital Management II, L.L.C.'s member or members are citizens of California and/or a California corporation or partnership, and on information and belief include Golden Gate Capital L.P. – a limited partnership formed under the laws of the State of California, with a principal place of business also at One Embarcadero Center, 39th

Floor, San Francisco, California 94111.   Golden Gate Capital L.P.'s principals are, on information and belief, California citizens, including Peter Morrow, Vice President of Eddie Bauer Parent LLC and a Principal of Golden Gate Capital L.P.  Accordingly, Eddie Bauer is a citizen of the State of California for diversity jurisdiction purposes.

13.    Defendant Kirk resides at 10011 NE 1st Street, Bellevue, Washington 98004, and is a citizen of the State of Washington for diversity jurisdiction purposes.  Kirk was the Senior Vice President of Global Sourcing for Lands' End until he accepted employment with Eddie Bauer, a direct competitor of Lands' End, as Senior Vice President of Production & Product Development, and resigned his employment with Lands' End.

14.    Defendant Armstead resides, upon information and belief, in the Bellevue, Washington area and is a citizen of the State of Washington for diversity jurisdiction purposes. Armstead was a Director of Global Logistics and Customs Compliance at Lands' End until she accepted employment with Eddie Bauer, a direct competitor of Lands' End, as Divisional Vice President of Global Logistics/Operations, and resigned her employment with Lands' End.

## JURISDICTION AND VENUE

15.    This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).  The action is between citizens of different states and the amount in controversy is in excess of $75,000.00, exclusive of interest and costs.

16.    This Court also has federal question jurisdiction over Count VIII pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1030 (Computer Fraud and Abuse Act) and supplemental jurisdiction over all other counts pursuant to 28 U.S.C. § 1367.

17.    This Court has personal jurisdiction over Eddie Bauer pursuant to 735 ILCS 5/2-209 given that Eddie Bauer is registered to do business in Illinois and is conducting business in at least seventeen separate Illinois locations.  These locations include at least twelve retail stores,

four outlet stores, and a support and administration facility located in Westmont, Illinois, which is in this District.

18.     This Court has personal jurisdiction over Kirk pursuant to a valid forum-selection clause under which Kirk consented to the personal jurisdiction of this Court.   (Executive Severance Agreement ("Executive Agreement"), Ex. A, at § 12.)  This Court also has personal jurisdiction over Kirk pursuant to 735 ILCS 5/2-209 based on the following facts set forth without limitation:  (i) Kirk entered into the Executive Agreement with Lands' End and Sears, and executed the Agreement in Illinois; (ii) Sears performed its obligations under the Executive Agreement in Illinois; (iii) Kirk regularly communicated with Sears' senior management in Illinois; (iv) Kirk regularly traveled to Sears' headquarters in Hoffman Estates, Illinois to meet with Sears' management; (v) Kirk was responsible for developing Lands' End's overseas purchasing office in Hong Kong, within Sears' overseas purchasing office, which involved having frequent contact with and directly impacting Sears' Illinois headquarters; (vi) during his development of Lands' End's overseas purchasing office in Hong Kong, Kirk had reporting relationships with key executives at Sears' headquarters in Hoffman Estates, Illinois, including Sears' Chief Executive Officer and President Bruce Johnson; and (vii) Kirk committed tortious acts, and conspired to commit tortious acts, directed at Sears in Illinois.

19.     This Court has personal jurisdiction over Armstead pursuant to a valid forum-selection clause under which Armstead consented to the personal jurisdiction of this Court. (Mutual Confidentiality Agreement ("Confidentiality Agreement"), Ex. B, at § 10.)  This Court also has personal jurisdiction over Armstead pursuant to 735 ILCS 5/2-209 based on the following facts set forth without limitation:  (i) Armstead entered into the Confidentiality Agreement with SHMC, and executed the Agreement in Illinois; (ii) SHMC performed its

obligations under the Confidentiality Agreement in Illinois; (iii) Armstead regularly communicated with SHMC's management in Illinois; (iv) Armstead regularly traveled to SHMC's headquarters in Hoffman Estates, Illinois to meet with SHMC personnel and management; (v) Armstead assisted in developing Lands' End's overseas purchasing office in Hong Kong, within Sears' overseas purchasing office, which involved having frequent contact with and directly impacting SHMC's Illinois headquarters; (vi) Armstead had reporting relationships with key executives at SHMC's headquarters in Hoffman Estates, Illinois; and (vii) Armstead committed tortious acts, and conspired to commit tortious acts, directed at SHMC in Illinois.

20.     Venue is proper within this jurisdictional district under 28 U.S.C. § 1391(a)(2) and (a)(3), and 28 U.S.C. § 1391(b)(2) and (b)(3).

### LANDS' END'S BUSINESS AND ITS GLOBAL SOURCING ORGANIZATION

21.     Lands' End is a leading retailer specializing in casual clothing, accessories, footwear for men, women and children, soft luggage and home furnishings. Lands' End conducts its business through catalog and internet sales and in its retail stores in the United States, the United Kingdom, Germany and Japan. Lands' End merchandise is carried in more than 300 Sears stores throughout the United States and Canada. Lands' End is known for offering unparalleled quality and value, and its unequivocal ironclad guarantee (customers may return Lands' End goods for any reason, at any time), all of which is made possible by Lands' End's proprietary global sourcing system and logistics organization.

22.     Lands' End was founded in Chicago, Illinois in 1963 by Gary Comer and operated on Elston Avenue. In June, 2002, Lands' End became a wholly-owned subsidiary of Sears, Roebuck and Co., which in 2005 merged with Kmart Holding Corporation to form Sears Holdings Corporation. Sears, through other of its subsidiaries and affiliates, including SHMC, is

the fourth largest broadline retailer in the United States and conducts business through retail, catalog and internet sales. Sears' subsidiaries and affiliates offer a vast array of products, including apparel, home merchandise, appliances and automotive products and services. SHMC manages approximately 2,300 Sears-branded and affiliated stores in the United States and Canada, including approximately 929 full-line department stores and roughly 1,200 specialty stores in the United States alone. Sears was founded in Chicago, Illinois in 1886 and each year it conducts billions of dollars of business in this District, and throughout Illinois.

23. Eddie Bauer is a direct competitor of Lands' End and SHMC. Eddie Bauer is a retailer specializing in casual clothing, accessories and home furnishings, and has approximately 370 retail stores throughout the United States and Canada, including Illinois. Eddie Bauer conducts its business through retail, catalog and internet sales.

24. Lands' End's "global sourcing system and organization" refers to Lands' End's proprietary system and organization that Lands' End utilizes to manage the development, technical design, manufacturing, and delivery of goods that Lands' End sells to consumers through its website, catalog, and retail locations. "Logistics" refers to the pricing and shipping aspects of Lands' End's supply chain. "Design" refers to the conceptual development of products, as opposed to "technical design," which refers to the refinement of product design for manufacturing and compliance. Global sourcing, logistics, and design work closely together. The management of international supply chains by Lands' End's global sourcing organization presents particularly unique challenges, as compared to the operation of a domestically-focused organization.

25. Prior to approximately 2006, Lands' End primarily relied on a third-party, independent buying agent for its global sourcing needs.

26.     In or around 2006, Lands' End began an initiative to fully internalize its global sourcing system and organization.  As part of that effort, Lands' End decided to set up a Hong Kong purchasing office, to eventually oversee functions that were being handled by an independent buying agent.  Because Sears already had a Hong Kong buying office, Lands' End set up its Hong Kong global sourcing organization within the same location.  Sears' Hong Kong purchasing office is owned by Sears Holdings Global Sourcing, Ltd. -- a Hong Kong corporation that is owned by Sears and is an Affiliate of Lands' End and SHMC for purposes of Kirk's and Armstead's Agreements discussed *infra* in this Complaint.  Lands' End manages the Hong Kong-based operations of its global sourcing organization, and the Hong Kong-based employees report to Lands' End.

27.     As Senior Vice President of Global Sourcing, Kirk directed and managed the development of Lands' End's global sourcing system and organization from 2006 up through his departure in 2009.  Kirk, who had joined Lands' End in 2004, was one of the highest paid and most senior employees at Lands' End.  He was responsible for obtaining from third party factories and sources throughout the world, particularly in Asia, the apparel, footwear, accessories and other goods sold by Lands' End in the United States, Canada and elsewhere. Kirk had frequent contact with key Lands' End sourcing, logistics and design employees in Hong Kong and the U.S.

28.     Beginning in 2006, Kirk worked directly with Sears' sourcing and logistics personnel to create Lands' End's Hong Kong global sourcing office.  Kirk made personnel decisions and was responsible for hiring new personnel to staff that office.  As a result of Kirk's efforts, Lands' End's Hong Kong global sourcing office was partially operational by 2007, handling some sourcing, while Lands' End's independent buying agent still handled other

sourcing. Lands' End ended its relationship with its Asian buying agent at the end of 2007, and all other buying agency relationships soon thereafter.

29.    Armstead began work at Lands' End in January, 2009 as a Transportation Consultant. Armstead was promoted to Director of Transportation in April, 2009. Armstead's responsibilities while at Lands' End were to manage the inbound, outbound and customs compliance logistics teams. She was also responsible to interface and communicate with the internal Lands' End global sourcing teams, and externally with vendors and the Sears transportation group.

30.    Lands' End's decision to bring its global sourcing operations fully in-house resulted in very significant cost savings to Lands' End, although the specific figures are highly confidential, proprietary and trade secret information. Similarly, the methods, procedures and operations by which Lands' End achieves those cost savings -- *i.e.*, its global sourcing system -- are highly confidential, proprietary and trade secret information. By the end of 2009, Lands' End and Sears' combined Hong Kong buying office was comprised of approximately 100 employees, 30-40 of whom were dedicated to Lands' End sourcing and logistics.

31.    Lands' End has invested substantial time, capital and effort in building and refining its global sourcing system and organization to ensure its success. Lands' End had a global sourcing operation prior to 2005, and has significantly developed and expanded its global sourcing organization over the last four years. Lands' End continues to make refinements and improvements to its processes for running its sourcing organization. Lands' End has developed confidential vendor guidelines and procedures governing a variety of subjects, including product quality, legal compliance, customs, shipping, and vendor costing. Lands' End maintains a confidential vendor website that is password protected and limited to Lands' End employees and

approved Lands' End vendors. Lands' End requires potential vendors to sign agreements that include confidentiality provisions before they can become an approved Lands' End vendor.

## LANDS' END'S PROPRIETARY AND CONFIDENTIAL TRADE SECRETS

32. Lands' End has developed a highly refined and carefully metered system for ensuring a smooth product development cycle, timely shipment and delivery of goods, and high quality products, all while keeping its costs low. Vendors, subject to confidentiality agreements, are part of this process and are informed of what Lands' End expects of them. Lands' End has developed a substantial amount of information, and a large number of procedures, processes, forms, spreadsheets, and reports to monitor the product development, manufacturing, quality control and shipping system. Some of these forms are internal to Lands' End, while others are provided to vendors in order to ensure that they continuously meet Lands' End's quality and compliance requirements, and confirm their compliance to Lands' End. Lands' End has developed a Standard Operating Procedure for vendors, which provides detailed information about the product development and delivery process, including detailed flow charts describing those processes. The information, forms, spreadsheets and reports developed by Lands' End support this carefully refined global sourcing system. Lands' End considers its overall system for global sourcing a proprietary and confidential trade secret.

33. Other proprietary and confidential information of Lands' End that is at issue in this case includes:

    a.     The identities of vendors and suppliers, including key contacts at such vendors and suppliers, who provide raw materials and manufacture Lands' End merchandise;

    b.     The pricing and cost information with Lands' End's vendors and suppliers, including the gross profit margins earned;

    c.     The terms and conditions of agreements and arrangements with Lands' End's vendors and suppliers;

12

    d.       Shipping rates and terms negotiated on behalf of Lands' End, including delivery speeds and shipment options;

    e.       Inventory control and management;

    f.       Pricing and sources of raw materials;

    g.       Future plans for product designs and product lines;

    h.       Lands' End marketing and business plans and short-term and long-term retail strategies and forecasts; and

    i.       Lands' End personnel information and files, including compensation structures, bonuses, employee duties and goals, metrics for determining achievement of performance objectives, strengths and weaknesses, performance evaluations, opportunities for advancement, reporting structures and other such non-public information.

34.    Lands' End has undertaken significant efforts to keep its information proprietary and confidential by advising employees of the importance of keeping information confidential and by, among other things:

    a.       Requiring key employees to acknowledge Lands' End's strict non-disclosure requirements;

    b.       Disseminating policy statements notifying employees of the value of Lands' End's trade secrets and confidential business information and of Lands' End's concern with maintaining the secrecy thereof, and notifying employees that their continued employment is conditioned upon compliance with corporate policies regarding maintaining the secrecy of trade secrets and confidential information;

    c.       Securing Lands' End's headquarters and offices with locks and an electronic keypad and alarm system, among other means;

    d.       Conducting exit interviews of its employees in which Lands' End confirms the return of all company records and other property; and

    e.       Requiring vendors to agree to confidentiality in writing.

35.    The trade secrets and confidential information described above have economic value by virtue of not being generally known to Lands' End's competitors such as Eddie Bauer, who would greatly benefit from access to this information. Particularly, while other companies

certainly have global sourcing organizations, Lands' End's global sourcing system was wholly developed by and for Lands' End and, therefore, is unique and proprietary to Lands' End.  A company starting its own global sourcing system, such as Eddie Bauer, would need years to develop the refined processes, practices, information, knowledge, and forms that make up Lands' End's unique and proprietary global sourcing system.

## KIRK'S EXECUTIVE AGREEMENT

36.    On May 6, 2009, Kirk executed the Executive Severance Agreement with Sears and its Affiliates, including Lands' End, that is attached as Exhibit 1 to the Declaration of Karl Dahlen in Support of Motion for Preliminary Injunction, which is being filed under seal herewith.

37.    The Agreement prohibits Kirk for a period of six months from directly or indirectly soliciting or encouraging any person to leave their employment with Lands' End or Sears or assisting in any way with the hiring of any Lands' End or Sears employee by any future employer or other entity.  (Executive Agreement, at § 4(a)(v).)

38.    The Agreement prohibits Kirk from using or disclosing Lands' End's and Sears' trade secrets and confidential business information, from converting their property and from engaging in conduct that results in a conflict of interest with Lands' End or Sears.  (*Id.* at § 4(a).)

39.    The Agreement provides, at Section 10, that "Sears shall be entitled to recovery of its attorneys' fees and other associated costs incurred as a result of any attempt to redress a breach by [Kirk] or to enforce its rights and protect its interests under the Agreement."  (*Id.* at § 10.)

## ARMSTEAD'S CONFIDENTIALITY AGREEMENT

40.    On October 29, 2009, Armstead executed the Mutual Confidentiality Agreement with SHMC, its affiliates (including Lands' End) and subsidiaries, that is attached as Exhibit 2 to

the Declaration of Karl Dahlen in Support of Motion for Preliminary Injunction, which is being

filed under seal herewith.

41.     As a result of Armstead's knowledge of Lands' End's confidential business

information regarding transportation and logistics, including pricing, vendors, terms, agreements,

and forecasts, the Confidentiality Agreement prohibits Armstead from disclosing or using

"Confidential Business Information" until three years after termination of the Confidentiality

Agreement. (Confidentiality Agreement, at §§ 1 and 3.)   Confidential Business Information

includes "any non-public information," including without limitation "requests for proposals,

requests for information, project plans, designs, drawings, analysis, research, price lists, product

lists, processes, methods, ideas, auction information, 'know how' and like, strategies, forecasts,

employee and vendor information, software..., hardware and system designs, architectures,

structure, and protocols." (*Id.* at § 1.1.1.)   Neither Armstead nor SHMC has terminated the

Confidentiality Agreement, as allowed by Section 3 of the Confidentiality Agreement. (*Id.* at §

3.)

42.     The Confidentiality Agreement provides, at Section 8:

> The Receiving Party [Armstead] acknowledges and agrees that in
> the event of any breach of this Agreement, the Disclosing Party
> [SHMC] would be irreparably and immediately harmed and could
> not be made whole by monetary damages alone.  Accordingly, the
> Parties agree that in the event the Receiving Party or any of its
> Representatives uses, disclose, or *(in the Disclosing Party's sole
> opinion) any such person is likely to use or disclose Confidential
> Information of the Disclosing Party* in breach of this Agreement,
> the Disclosing Party, in addition to any other remedy to which it
> may be  entitled in law or equity, shall be entitled to seek equitable
> relief, including temporary and permanent injunctive relief and
> specific performance without the requirement of having to post a
> bond or other security and shall be entitled to the recovery of its
> attorneys' costs, fees and expenses as part of such action.

(*Id.* at § 8 (emphasis added).)

## KIRK AND EDDIE BAUER RAIDED LANDS' END'S
## SOURCING AND LOGISTICS EMPLOYEES, SYSTEM AND DOCUMENTS

43.    On information and belief, Kirk planned to join Eddie Bauer for the purpose of helping Eddie Bauer create an internal global sourcing operation well before Kirk executed the Executive Agreement on May 6, 2009, and long before he resigned from Lands' End on November 6, 2009.

44.    On information and belief, in furtherance of his plan to leave Lands' End, on or about February 5, 2009, Kirk sold his house in Wisconsin and moved into a temporary apartment.

45.    On or about October 26, 2009, Kirk informed Lands' End that he had accepted a position with Eddie Bauer and was moving to the Seattle, Washington area.   Lands' End reminded him of his legal obligations under the Executive Agreement, to which Kirk responded that he had been receiving legal counsel regarding the Executive Agreement.   When asked about his decision to leave Lands' End and join Eddie Bauer, Kirk said that his compensation package with Eddie Bauer was to include a percentage of the savings that he achieved for Eddie Bauer, which would likely be a significant amount of money.

46.    In the discussions that followed, Kirk requested that he be allowed to take with him to Eddie Bauer three additional key Lands' End employees from within Lands' End's global sourcing organization, asking that these individuals be "red-circled" as exceptions to the Executive Agreement's non-solicitation restriction.   Lands' End did not agree.   The three individuals in question were John Kilmurray, Malinda Van Sant and Hulya Provenzano.

47.    Despite the provisions of Kirk's Executive Agreement barring him from poaching Lands' End employees, almost immediately after Kirk joined Eddie Bauer, he and Eddie Bauer began raiding Lands' End's employees wholesale.   As a result, in the first half of 2010, Kirk and

Eddie Bauer successfully solicited the following Lands' End global sourcing, logistics, and design employees to leave Lands' End and join Kirk at Eddie Bauer:

1.   <u>John Kilmurray.</u>  John Kilmurray ("Kilmurray") was Director of Global Sourcing, Asia at Lands' End's Hong Kong purchasing office.  He notified Lands' End of his resignation on or about December 9, 2009, and left Lands' End on January 29, 2010.  He is now Vice President of Global Sourcing, Asia for Eddie Bauer.

2.   <u>Josephine Tang.</u>  Josephine Tang ("Tang") was a Senior Sourcing Specialist at Lands' End's Hong Kong purchasing office.  She resigned effective January 29, 2010, and is now working in Eddie Bauer's Hong Kong buying office.

3.   <u>Rosalie Yeung.</u>  Rosalie Yeung ("Yeung") was Executive Assistant to Kilmurray and the Lands' End Hong Kong purchasing office.  She resigned effective January 29, 2010, and is now working for Kilmurray in Eddie Bauer's Hong Kong buying office.  While at Lands' End, in connection with her job duties, Yeung was given direct and immediate access to all of the procedures, processes, forms Lands' End used in operating its global sourcing system.

4.   <u>Karen Chun.</u>  Karen Chun ("Chun") an Associate Fabric Technician in Lands' End's Hong Kong buying office.  She resigned effective March 31, 2010, and is now working in Eddie Bauer's Hong Kong buying office.

5.   <u>Malinda Van Sant.</u>  Malinda Van Sant ("Van Sant") was Senior Director of Global Sourcing at Lands' End.  She notified Lands' End of her resignation on or about April 19, 2010, and left Lands' End on May 7, 2010.  She is now Divisional Vice President of Global Sourcing for Eddie Bauer.

6.   <u>Sharon Armstead.</u>  Sharon Armstead ("Armstead") was Director of Global Logistics for Lands' End.  Although she accepted an employment offer from Eddie Bauer on or about April 28, 2010, Armstead waited until May 17, 2010 to notify Lands' End of her resignation.  Armstead left Lands' End on May 24, 2010.  She is now Divisional Vice President of Global Logistics/Operations within the Global Sourcing Department at Eddie Bauer.

7.   <u>Hulya Provenzano.</u>  Hulya Provenzano ("Provenzano") was Senior Sourcing Manager at Lands' End.  She notified Lands' End of her resignation on or about May 17, 2010, and left Lands' End on May 28, 2010.  She is now Senior Product Development/Production Manager at Eddie Bauer.

8.   Ernesto Ramirez.   Ernesto Ramirez ("Ramirez") was Design Director at Lands' End.  He notified Lands' End of his resignation on or about May 5, 2010, and left Lands' End on May 20, 2010.  He is now Vice President of Men's Design at Eddie Bauer.

9.   Sharon Devaney.   Sharon Devaney ("Devaney") was Technical Manager at Lands' End's Hong Kong purchasing office.  She left Lands' End on April 27, 2010, and is now working in Eddie Bauer's Hong Kong buying office.

10.  Alan Clarke.   Alan Clarke ("Clarke") was Senior Manager of Fabric/Color, Asia at Lands' End's Hong Kong purchasing office.  He left Lands' End on June 18, 2010.  Upon information and belief, he is working for Eddie Bauer in its Hong Kong buying office.

11.  Toro Sirinun.   Toro Sirinun ("Sirinun") was Senior Specialist of Production & Quality Asia in Lands' End's Hong Kong purchasing office. He left Lands' End on June 22, 2010, and is now working in Eddie Bauer's Hong Kong buying office.

12.  Jennifer Radulski.   Jennifer Radulski ("Radulski") was Product Development Manager at Lands' End.  She interviewed with Eddie Bauer on or about April 23, 2010 and finally notified Lands' End of her resignation on or about May 24, 2010.  Radulski left Lands' End on June 15, 2010.

13.  Martin Chung.   Martin Chung ("Chung") was a Senior Designer at Lands' End.  He notified Lands' End of his resignation on or about June 14, 2010, and left Lands' End on June 29, 2010.  He is now a Senior Designer at Eddie Bauer.

14.  Renee Hines.   Renee Hines ("Hines") was an Associate Designer at Lands' End.  She notified Lands' End of her resignation on or about June 14, 2010, and left Lands' End on June 25, 2010.  She is now Associate Technical Designer at Eddie Bauer.

48.   Eddie Bauer and Kirk also attempted to solicit the following employees, but were unsuccessful:

1.   Lucy Angulo.   Lucy Angulo ("Angulo") is a Senior Manager, Product Development at Lands' End.  She was solicited and recruited by Kirk to join Eddie Bauer in February and March, 2010.

2.   James Henley.   James Henley ("Henley") is a Design Director at Lands' End.  He was solicited and recruited to join Eddie Bauer in May, 2010.

3.   <u>Susil Guruginghe.</u>   Susil Guruginghe ("Guruginghe") is a Quality
Specialist for Lands' End.  He was solicited and recruited by Kilmurray to
join Eddie Bauer in April or May, 2010.

49.     On information and belief, Eddie Bauer and Kirk made a coordinated and
concerted effort to recruit a sizeable group of employees *en masse*.  On further information and
belief, Eddie Bauer and Kirk conspired with then-current Lands' End employees, including
Malinda Van Sant, to identify, contact and recruit additional targets, even though the employees
assisting and conspiring with Kirk and Eddie Bauer still worked at Lands' End.

50.     Kirk directly solicited and interviewed Lands' End employees before the non-
solicitation provision of his Agreement expired.

51.     Even other competitors were aware of the plan to leave *en masse*.  For example,
Nancy Parker-White, a J.C. Penny employee, wrote the following message in an email to
Jennifer Radulski before Ms. Radulski had announced her intention to leave Lands' End:

So they [Lands' End] will have no sourcing ... no Product
development.  Good times.

52.     Many employees hid their intent to leave and reasons for leaving.  At least five of
the employees who followed Kirk to Eddie Bauer expressly -- and falsely -- denied that they
were joining Eddie Bauer.  For example, Sharon Armstead informed Lands' End that she was
contemplating a number of potential job opportunities, even though she had agreed to join Eddie
Bauer nearly three weeks earlier.   When he announced his resignation, John Kilmurray
specifically disclaimed any plan to join Eddie Bauer.  Upon announcing her resignation, Malinda
Van Sant indicated that she was spending the summer in Madison, Wisconsin to "find herself"
and had no new employment plans.  Hulya Provenzano indicated that she was moving to
California where her husband was pursuing an acting career.  Jennifer Radulski denied that she

was going to Eddie Bauer and said she was pursuing some other opportunities, including one at

J.C. Penney.

53.     After repeatedly denying any contact with Eddie Bauer and Kirk, in an attempt to

protect Kirk – she was aware of his non-solicitation restrictions – Ms. Radulski provided Lands'

End's management with a written statement, admitting that she had been solicited by Kirk well

before May 6, 2010, which was the last day of Kirk's six-month non-solicitation period pursuant

to the Agreement, and was leaving Lands' End to join Eddie Bauer:

> Alan Kirk called me on my cellphone and asked me if interested in
> coming to Eddie Bauer . . . I interviewed with Alan Kirk in April,
> 2010 for 1 hour (the second to the last weekend of April).  He
> discussed his plans for Eddie Bauer and asked me to join.  I
> interviewed on April 23, 2010 . . . I have accepted employment
> with Eddie Bauer and set to start on June 28, 2010.

54.     Several employees working with Kirk and Eddie Bauer had decided to leave

Lands' End long before they actually did so:

    a.    Malinda Van Sant listed her Wisconsin home for sale on February 23, 2010.  She did not resign from Lands' End until an effective date of May 7, 2010.

    b.    Jennifer Radulski met with Kirk at Eddie Bauer's headquarters on April 23, 2010, and listed her home in Wisconsin for sale eight days later -- May 1, 2010 -- but did not tender her resignation until May 24, 2010, and did not admit she was leaving to join Eddie Bauer until June 2, 2010.

    c.    Hulya Provenzano listed her Wisconsin home for sale on March 8, 2010, in connection with her acceptance of Kirk's offer of employment at Eddie Bauer -- well in advance of her last day at Lands' End on May 28, 2010.

55.     On information and belief, these and other former employees delayed their

resignations in an attempt to (i) evade Kirk's 6-month non-solicitation restriction under the

Executive Agreement; (ii) maintain electronic and physical access to Lands' End's trade secrets

and confidential business information; and (iii) take an intact group of sourcing and logistics

employees, all at once, before Lands' End could respond and take steps to minimize or counter Kirk's recruitment efforts.

56.     In furtherance of this scheme, Kirk and Eddie Bauer made the solicited employees contractually agree, as a condition of employment with Eddie Bauer, that they were not solicited by Kirk or any other Lands' End employee(s):

> This offer of employment is conditioned upon your acknowledgment that you were not solicited to leave your current employer by any current or former employee of your current employer.

(*See, e.g.*, May 5, 2010 offer letter from Eddie Bauer to Sharon Armstead, Ex. 4 to the Declaration of Karl Dahlen in Support of Motion for Preliminary Injunction, which is being filed under seal herewith.)

57.     Such contractual commitment was a patently false representation, as the written offer letter expressly states:

> This will confirm *Alan Kirk's offer of employment* [to Sharon Armstead] as Director of Global Sourcing Operations in the Global Sourcing Department.

(*Id.* (emphasis added))

## EDDIE BAUER'S, KIRK'S AND ARMSTEAD'S MISAPPROPRIATION OF LANDS' END'S PROPRIETARY GLOBAL SOURCING SYSTEM

58.     Eddie Bauer, Kirk and Armstead did not merely solicit employees, but also took documents and proprietary information wholesale from Lands' Ends' files and computer systems.

59.     The purpose of taking these documents in addition to the extensive employee raiding was to ensure that Eddie Bauer could have an intact global sourcing system and organization without having to incur the time and expenses ordinarily associated with developing such a global sourcing organization from the ground up.

21

60.     Sharon Armstead met with Kirk at Eddie Bauer's headquarters on April 26, 2010, and, before she resigned from Lands' End approximately three weeks later on May 17, 2010, sent at least 38 emails containing Lands' End's trade secrets and confidential business information from her Lands' End corporate email account to her private AOL e-mail account. Armstead sent these emails on April 29, May 3-6 and May 10-13, 2010. Armstead then deleted the sent emails from her Lands' End email account and Lands' End's computer system in an attempt to hide her activities. At the time that she sent these emails, Armstead was covered by the Confidentiality Agreement, pursuant to which she was obligated to maintain the confidentiality of the very information that she was taking.

61.     The e-mails that Armstead transmitted to her private email account contained documents relating to Lands' End's proprietary sourcing and logistics system and operations. These documents contained, either in their body or as attachments, trade secrets and confidential business information as defined herein belonging to Lands' End, including, but not limited to, the following:

a.     Rate File for Ocean Carriers Effective 5/1/10 (provided to Armstead on 5/5/10), containing detailed new shipping rates negotiated by Sears/Lands' End;

b.     Air Freight Pricing Rates for Asia for Second Quarter 2010 from Expeditors International, and comparing with rates negotiated with other carriers;

c.     Objectives for Logistics 2010 – blue print for Lands' End's Logistics department setting forth specific goals and Corporate Strategy-Strategy Initiatives;

d.     Master Data 2008 Analysis for Ocean and Dray, containing hundreds of pages of specific invoice shipping rates and data;

e.     Terms of Pricing on Lands' End's First Sale Program Agreement;

f.     Sears Ocean Contract 5-01-08 to 4-30-09 Sail Schedules;

g.   Information on pending Lands' End sourcing and logistics issues (as of May 11, 2010) on classification of apparel goods;

h.   Sears RFP for International Freight Forwarding, laying out key terms of contract and bid instructions;

i.   Sears Ocean Contract Discrepancy Info - Land Details, containing information on volume of shipments;

j.   Updated information (provided to Armstead on May 10, 2010) on Sears shipping contract language; and

k.   10+2 Importer Security Filing – Important Vendor Logistics Announcement.

62.   The foregoing misappropriation occurred in furtherance of Armstead's assurances to Kirk that "I will be able to hit the ground [at Eddie Bauer] running."

63.   Other evidence of Eddie Bauer's misappropriation and use of Lands' End confidential and proprietary business processes and documents have been found on Eddie Bauer's global sourcing website.  Eddie Bauer's global sourcing website is password protected, just as Lands' End's global sourcing website is.  However, Eddie Bauer allowed some portions of the Eddie Bauer global sourcing website (which was created in February, 2010) to become publicly available as Google cached pages.  Those cached pages reveal that Eddie Bauer's global sourcing website contains copies of Lands' End documents that form a part of Lands' End's global sourcing system, some of which still contain metadata indicating that they originated with Lands' End.  Other pages reveal that Eddie Bauer has adopted critical process measures, such as Lands' End's  "SOP (Standard Operating Procedure) Product Sourcing Guide (Apparel)" manual, with Eddie Bauer's version being substantively, and almost literally, identical to Lands' End's version.

64.   Lands' End has been forced to replace a substantial portion of its Hong Kong purchasing office and has even had to relocate a management employee from the United States

to Hong Kong in an effort to fill the management void and correct the resulting supply chain delays caused by Eddie Bauer's and Kirk's employee pirating efforts, and to halt the exodus of employees created by Kirk's and Eddie Bauer's *en masse* solicitations.

65.     While Eddie Bauer has reaped the benefits of its and Kirk's wrongful conduct, including obtaining a turnkey operation that includes employees as well as Lands' End's proprietary global sourcing system, in the form of operating manuals, procedures, processes, and other information, Lands' End has been saddled with having to incur substantial costs, both in terms of money and the valuable time of Lands' End's management and personnel to locate, recruit, hire and train replacement employees for the minimum of fourteen employees pirated over to Eddie Bauer, as well as Kirk himself.

66.     Eddie Bauer's, Kirk's and Armstead's illegal activities have given Eddie Bauer a head start on what would have otherwise been a lengthy and drawn-out process of building an internal global sourcing system and organization from the ground up.

## COUNT I – MISAPPROPRIATION OF TRADE SECRETS
## AGAINST EDDIE BAUER, KIRK AND ARMSTEAD

67.     Plaintiffs herein incorporate the preceding allegations of this Complaint.

68.     Lands' End's trade secrets, including without limitation its proprietary global sourcing system, comprised of at least its procedures, processes, manuals, reports, spreadsheets, guidelines, forms, and standards, and including also its specific confidential business information described above, such as shipping rates, business goals and objectives, and analyses of preferred shipping lanes, constitute "trade secrets" under the Wisconsin Uniform Trade Secrets Act, Wis. Stat. § 134.90, and such trade secrets and information have been misappropriated by Eddie Bauer, Kirk and Armstead.

69.     On information and belief, Eddie Bauer, Kirk and Armstead misappropriated other trade secrets and confidential business information, in addition to that which is set forth in this Complaint.

70.     Lands' End undertakes reasonable and appropriate efforts to maintain the secrecy of its trade secrets and confidential business information.

71.     Eddie Bauer, Kirk and Armstead were at all times aware of the trade secret misappropriation and knowingly used the misappropriated information to, among other things, obtain an unfair head start in building Eddie Bauer's internal global sourcing organization, which, absent the trade secret misappropriation committed by Eddie Bauer, Kirk and Armstead, would have taken several years, rather than just a few months.

72.     Eddie Bauer, Kirk and Armstead have acted willfully and maliciously in misappropriating Lands' End's trade secrets, making an award of punitive damages appropriate under Wis. Stat. § 134.90(4).

73.     Eddie Bauer, Kirk and Armstead have acted willfully and deliberately in misappropriating Lands' End's trade secrets, making an award of attorneys' fees appropriate under Wis. Stat. § 134.90(4).

74.     As a result of Eddie Bauer's, Kirk's and Armstead's misappropriation, threatened misappropriation and/or inevitable misappropriation of Lands' End's trade secrets and confidential business information, as well as the resulting damage to Lands' End's competitive position, Lands' End has suffered and will continue to suffer irreparable injury.  Lands' End has no remedy at law that is as full, complete and efficient as preliminary and permanent injunctive relief to prevent further injury resulting from Eddie Bauer's, Kirk's and Armstead's misappropriation, threatened misappropriation and other wrongful acts.

75.     While the full scope of damages is not presently calculable, Lands' End has suffered damages in addition to the irreparable injury caused by Eddie Bauer's, Kirk's and Armstead's actions.   These damages will continue to accrue so long as Eddie Bauer, Kirk and Armstead are not enjoined from using and/or disclosing Lands' End's trade secrets and confidential business information.

**COUNT II – CIVIL CONSPIRACY AGAINST EDDIE BAUER, KIRK AND ARMSTEAD**

76.     Plaintiffs herein incorporate the preceding allegations of this Complaint.

77.     Eddie Bauer, Kirk and Armstead engaged in a conspiracy amongst themselves and in concert with a number of former Lands' End employees to harm Lands' End through targeted mass raiding of Lands' End employees, to misappropriate Lands' End's trade secrets and confidential business information through illegal means, to induce breaches of the fiduciary duties of former Lands' End employees, and to tortiously interfere with Lands' Ends' contractual and economic relationships with its employees.

78.     On information and belief, Kirk and Eddie Bauer agreed to this conspiracy before Kirk left Lands' End, and other former Lands' End employees agreed to this conspiracy while those former Lands' End employees were still employed at Lands' End.

79.     As a result of this conspiracy, Lands' End has been damaged by the deliberate harm caused by the conspiracy to target a substantial number of key Lands' End employees, and by the conspiracy to misappropriate Lands' End's trade secrets and confidential business information through illegal means.

80.     While the full scope of damages is not presently calculable, Lands' End has suffered damages in addition to the irreparable injury caused by Eddie Bauer's, Kirk's and Armstead's actions.

## COUNT III– BREACH OF CONTRACT AGAINST KIRK

81.     Plaintiffs herein incorporate the preceding allegations of this Complaint.

82.     The Executive Agreement dated May 6, 2009, and attached hereto and incorporated herein as Exhibit A, is a valid and binding contract, supported by sufficient consideration, that is enforceable against Kirk by Sears, Lands' End, which is an Affiliate of Sears for purposes of the Executive Agreement, and SHMC, which also is an Affiliate of Sears for purposes of the Executive Agreement.

83.     Kirk has breached the Executive Agreement, during his employment with Lands' End and thereafter, in that he has: (i) solicited, encouraged and assisted in the hiring of employees to leave their employment and join a competitor, namely Eddie Bauer; (ii) used, disclosed and misappropriated Lands' End's trade secrets and Plaintiffs' confidential business information during the course of such employee solicitations and in the building of a competing global sourcing organization at Eddie Bauer; and (iii) engaged in a concerted course of activity with Eddie Bauer resulting in a conflict of interest with Plaintiffs, for the purpose of unlawfully and unfairly competing against Plaintiffs.

84.     As a result of Kirk's violation of his contractual obligations, Plaintiffs have suffered damages.

## COUNT IV– BREACH OF CONTRACT AGAINST ARMSTEAD

85.     Plaintiffs herein incorporate the preceding allegations of this Complaint.

86.     The Confidentiality Agreement dated October 29, 2009, and attached hereto and incorporated herein as Exhibit B, is a valid and binding contract, supported by sufficient consideration, that is enforceable against Armstead by SHMC, Sears, which is an Affiliate of SHMC for purposes of the Confidentiality Agreement, and Lands' End, which also is an Affiliate of SHMC for purposes of the Confidentiality Agreement.

87.     Armstead has breached the Confidentiality Agreement, during her employment with Lands' End and thereafter, in that she has: (i) used, disclosed and misappropriated Lands' End's trade secrets and confidential business information in connection with the building of a competing global sourcing organization at Eddie Bauer; and (ii) engaged in a concerted course of activity with Eddie Bauer resulting in a conflict of interest with Plaintiffs, for the purpose of unlawfully and unfairly competing against Plaintiffs.

88.     As a result of Armstead's violation of her contractual obligations, Plaintiffs have suffered damages.

## COUNT V – BREACH OF FIDUCIARY DUTY
## AND DUTY OF LOYALTY AGAINST KIRK

89.     Plaintiffs herein incorporate the preceding allegations of this Complaint.

90.     As Senior Vice President of Global Sourcing at Lands' End, Kirk occupied a position of confidence and trust, and owed Lands' End a fiduciary duty and duty of undivided loyalty in all matters within the scope of his employment, a duty to disclose to Lands' End information material to his employment and a duty to protect and not to misuse trade secrets and confidential business information obtained from Lands' End during the course of his employment.

91.     Pursuant to these duties, Kirk was obligated to use his best efforts on behalf of Lands' End and to refrain from acting in a manner inconsistent with or contrary to the best interests of Lands' End prior to his resignation.

92.     Upon information and belief, Kirk breached said duties and continues to breach said duties by, among other things, soliciting, encouraging and assisting employees to leave Lands' End and join a competitor, namely Eddie Bauer, and using and continuing to use Lands'

End's trade secrets and confidential business information to benefit Eddie Bauer, and at the same time harm Lands' End.

93.     Lands' End has suffered and will continue to suffer irreparable injury as well as damages, as a result of Kirk's breaches of his fiduciary duty and duty of loyalty. Lands' End has no remedy at law that is as full, complete and efficient as preliminary and permanent injunctive relief to prevent further injury resulting from Kirk's breaches of fiduciary duty and duty of loyalty.

**COUNT VI – BREACH OF FIDUCIARY DUTY**
**AND DUTY OF LOYALTY AGAINST ARMSTEAD**

94.     Plaintiffs herein incorporate the preceding allegations of this Complaint.

95.     As Director of Global Logistics and Customs Compliance at Lands' End, Armstead occupied a position of confidence and trust, and owed Lands' End a fiduciary duty and duty of undivided loyalty in all matters within the scope of her employment, a duty to disclose to Lands' End information material to her employment and a duty to protect and not to misuse trade secrets and confidential business information obtained from Lands' End during the course of her employment.

96.     Pursuant to these duties, Armstead was obligated to use her best efforts on behalf of Lands' End and to refrain from acting in a manner inconsistent with or contrary to the best interests of Lands' End prior to her resignation.

97.     Upon information and belief, Armstead breached said duties and continues to breach said duties by, among other things, using and continuing to use Lands' End's trade secrets and confidential business information to benefit Eddie Bauer, and at the same time harm Lands' End.

98.     Lands' End has suffered and will continue to suffer irreparable injury as well as damages, as a result of Armstead's breaches of his fiduciary duty and duty of loyalty. Lands' End has no remedy at law that is as full, complete and efficient as preliminary and permanent injunctive relief to prevent further injury resulting from Armstead's breaches of fiduciary duty and duty of loyalty.

## COUNT VII - INDUCEMENT OF BREACH OF FIDUCIARY DUTIES AND DUTIES OF LOYALTY AGAINST EDDIE BAUER

99.     Plaintiffs herein incorporate the preceding allegations of this Complaint.

100.    Eddie Bauer was aware that Kirk owed a fiduciary duty and duty of loyalty to Lands' End.

101.    On information and belief, Eddie Bauer was a knowing beneficiary of Kirk's breaches of his fiduciary duty and his duty of loyalty owed to Lands' End.

102.    On information and belief, Eddie Bauer was an active and intentional participant in Kirk's breaches of his fiduciary duty and his duty of loyalty owed to Lands' End.

103.    On information and belief, Eddie Bauer encouraged and aided Kirk to breach his fiduciary duty and his duty of loyalty to Lands' End by soliciting his co-workers and subordinates to resign and join Eddie Bauer, misappropriating Lands' End's trade secrets and confidential business information, and facilitating unfair and unlawful competition against Lands' End.

104.    Eddie Bauer was aware that Armstead owed a fiduciary duty and duty of loyalty to Lands' End.

105.    On information and belief, Eddie Bauer was a knowing beneficiary of Armstead's breaches of her fiduciary duty and her duty of loyalty owed to Lands' End.

106.    On information and belief, Eddie Bauer was an active and intentional participant in Armstead's breaches of her fiduciary duty and her duty of loyalty owed to Lands' End.

107.    On information and belief, Eddie Bauer encouraged and aided Armstead to breach her fiduciary duty and her duty of loyalty to Lands' End by misappropriating Lands' End's trade secrets and confidential business information, and facilitating unfair and unlawful competition against Lands' End.

108.    Eddie Bauer induced, encouraged and aided the targeted Lands' End's global sourcing and logistics employees, including without limitation Kirk and Armstead, to breach their fiduciary duties and duties of loyalty owed to Lands' End and/or knowingly accepted the benefits of the breaches of such duties.

109.    Lands' End has suffered and will continue to suffer irreparable injury and damages as a result of Eddie Bauer's inducement of Kirk and Armstead to breach their respective fiduciary duties and duties of loyalty owed to Lands' End.  Lands' End has no remedy at law that is as full, complete and efficient as preliminary and permanent injunctive relief to prevent further injury resulting from Eddie Bauer's inducement of Kirk's and Armstead's respective breaches of their fiduciary duties and their duties of loyalty owed to Lands' End.

## COUNT VIII - TORTIOUS INTERFERENCE
## WITH CONTRACTS AGAINST EDDIE BAUER

110.    Plaintiffs herein incorporate the preceding allegations of this Complaint.

111.    Plaintiffs have a valid and binding Executive Agreement with Kirk containing an employee non-solicitation agreement, and a separate and distinct non-disclosure of confidential business information agreement.  (Ex. A.)

112.    Eddie Bauer tortiously interfered with the Executive Agreement that Plaintiffs have with Kirk for an improper purpose by the conduct set forth herein.

113.    Eddie Bauer had knowledge of the Executive Agreement that Plaintiffs have with Kirk, and knowingly interfered with the Executive Agreement that Plaintiffs have with Kirk and knowingly benefitted from Kirk's breaches of that Executive Agreement.

114.    Plaintiffs have a valid and binding Confidentiality Agreement with Armstead containing a non-disclosure of confidential business information agreement.  (Ex. B.)

115.    Eddie Bauer tortiously interfered with the Confidentiality Agreement that Plaintiffs have with Armstead for an improper purpose by the conduct set forth herein.

116.    Eddie Bauer had knowledge of the Confidentiality Agreement that Plaintiffs have with Armstead, and knowingly interfered with the Confidentiality Agreement that Plaintiffs have with Armstead and knowingly benefitted from Armstead's breaches of that Confidentiality Agreement.

117.    Plaintiffs have suffered and will continue to suffer irreparable injury and damages as a result of Eddie Bauer's tortious interference with Kirk's Executive Agreement, and with Armstead's Confidentiality Agreement.  Plaintiffs have no remedy at law that is as full, complete and efficient as preliminary and permanent injunctive relief to prevent further injury resulting from Eddie Bauer's current and future use, disclosure, misappropriation, solicitation and other wrongful acts.

### COUNT IX - TORTIOUS INTERFERENCE WITH ECONOMIC EXPECTANCY - EMPLOYEE PIRATING AGAINST EDDIE BAUER AND KIRK

118.    Plaintiffs herein incorporate the preceding allegations of this Complaint.

119.    At all relevant times, Lands' End and its Affiliates, including without limitation Sears Holdings Global Sourcing, Ltd., have enjoyed valid business relationships with their employees, of which Kirk and Eddie Bauer were aware.

120.   Eddie Bauer and Kirk intentionally interfered with such relationships, in that Kirk and Eddie Bauer induced at least fourteen key global sourcing and logistics directors, managers and employees of Lands' End and its Affiliates to terminate their employment *en masse* and to commence employment with Eddie Bauer.

121.   Eddie Bauer and Kirk benefitted from interference with these employment relationships by obtaining Lands' End's trade secrets and confidential business information from these employees, obtaining an intact, trained and experienced global sourcing employee group, obtaining a well-developed, highly successful, proprietary global sourcing system, and decimating and creating a void in the operations of Lands' End's internal global sourcing organization.

122.   Eddie Bauer's and Kirk's intentional interference with employment relationships between Lands' End and its Affiliates and the employees has been for the improper and wrongful purposes of directly injuring the business of Lands' End, decimating and creating a void in the operations of its global sourcing organization, obtaining trade secrets and confidential business information from the pirated employees, interfering with Lands' End's global sourcing operations, and to unlawfully and unfairly compete with Lands' End.

123.   Lands' End has suffered and will continue to suffer irreparable injury and damages as a result of Eddie Bauer's and Kirk's systematic pirating of Lands' End's and its Affiliates' employees. Lands' End has no remedy at law that is as full, complete and efficient as preliminary and permanent injunctive relief to prevent further injury resulting from Eddie Bauer's and Kirk's piracy of Lands' End's and its Affiliates' employees and other wrongful acts as set forth herein.

## COUNT X – COMPUTER FRAUD AND ABUSE ACT,
## 18 U.S.C. § 1030, AGAINST EDDIE BAUER, KIRK AND ARMSTEAD

124.    Plaintiffs herein incorporate the preceding allegations of this Complaint.

125.    On information and belief, Eddie Bauer directed, encouraged and/or caused Kirk, Armstead, and other departing Lands' End employees to use Lands' End's computers to engage in conduct that was not authorized by Lands' End.

126.    On information and belief, Eddie Bauer directed, approved, or knowingly accepted the benefits of the improper access by certain former Lands' End employees, including without limitation Armstead, of Lands' End computers after those employees had accepted employment with Eddie Bauer.

127.    When Kirk, Armstead and other departing employees began acting in the interests of Eddie Bauer, while still employed at Lands' End, they breached their respective fiduciary duties and duties of loyalty to Lands' End, thereby ending their agency relationship with Lands' End. When the respective agency relationships between Kirk, Armstead and the other departing employees and Lands' End terminated, any and all authorization those departing employees had to access Lands' End's computers and computer systems also ended. Moreover, those employees never had authorization to access Lands' End's computers for the purpose of obtaining information for the benefit of, and transmitting information to, a Lands' End competitor such as Eddie Bauer. Therefore, any and all information Kirk, Armstead and other departing employees obtained from Lands' End's computers and computer systems for the benefit of Eddie Bauer was obtained without authorization.

128.    On information and belief, certain former Lands' End employees accessed Lands' End's global sourcing website using login information that was provided to them when they were

Lands' End employees, to obtain documents and information from the password-protected website without authorization.

129.    Eddie Bauer's, Kirk's and Armstead's respective conduct violates the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*  On information and belief, Kirk, Armstead and other departing employees knowingly and intentionally accessed and used, and conspired with Eddie Bauer and others to access and use, Lands' End's protected and secure computers and computer systems, without authorization or in excess of their authorization, to do the following:

    a.    Obtain confidential business information from Lands' End's protected computers, for the benefit of Eddie Bauer and in violation of 18 U.S.C. § 1030 (a)(2)(C);

    b.    Conspire to defraud Lands' End into believing that departing employees, including without limitation Armstead, were acting solely on Lands' End's behalf when in fact they were acting for the benefit of Eddie Bauer by retaining access to Lands' End's computer system and confidential business information, acting in furtherance of that fraud and obtaining something of value as a result of that fraud, which has a value exceeding five thousand dollars ($5,000.00) in a one-year period, in violation of 18 U.S.C. § 1030(a)(4); and

    c.    Knowingly causing and conspiring to cause the transmission of a program, information, code, or command, and/or intentionally accessing the protected computers of Lands' End, without authorization and, as a result of such conduct, recklessly causing damage and loss to a protected computer in violation of 18 U.S.C. § 1030(a)(5)(A)-(C).

130.    On information and belief, Eddie Bauer, Kirk and Armstead have caused Lands' End to incur damage and losses exceeding five thousand dollars ($5,000.00) during a one-year period in violation of  18 U.S.C. § 1030(g) and (c)(4)(A)(i)(I).

131.    The protected computers accessed by Kirk, Armstead and other departing employees were used in interstate commerce as defined by 18 U.S.C. § 1030(e), where Lands' End employees used the computers to communicate and work with Lands' End employees

throughout the United States and internationally, including employees working at the Lands' End purchasing office in Hong Kong.

132. Lands' End has suffered irreparable injury and damages from Eddie Bauer's, Kirk's and Armstead's violations of 18 U.S.C. § 1030 *et seq.* Lands' End has no remedy at law that is as full, complete and efficient as preliminary and permanent injunctive relief to prevent further injury resulting from Eddie Bauer's, Kirk's and Armstead's respective wrongful acts.

## COUNT XI – UNJUST ENRICHMENT
## AGAINST EDDIE BAUER, KIRK AND ARMSTEAD

133. Plaintiffs herein incorporate the preceding allegations of this Complaint.

134. Eddie Bauer, Kirk and Armstead have received the benefit of possessing and using Lands' End's trade secrets and confidential business information that were compiled or created by or on behalf of Lands' End, using Lands' End's time, resources and materials. Eddie Bauer unlawfully obtained this benefit through Kirk's, Armstead's and other former Lands' End employees' theft of Lands' End's trade secrets and confidential business information.

135. Eddie Bauer, Kirk and Armstead have further received the benefit of Lands' End's years of recruitment, development and training of an experienced internal global sourcing system and organization and Hong Kong-based purchasing office, which it unjustly received, retained and used in the start-up of its own internal sourcing organization and its new Hong Kong purchasing office.

136. Eddie Bauer, Kirk and Armstead have direct knowledge of the benefits they have received from their use of Lands' End's trade secrets and confidential business information and Lands' End's experienced global sourcing personnel.

137. Eddie Bauer, Kirk and Armstead accepted and retained the benefits of Lands' End's trade secrets and confidential business information and experienced sourcing personnel.

138.    Lands' End has suffered irreparable injury and damages as a result of the conduct described above.  Lands' End has no remedy at law that is as full, complete and efficient as preliminary and permanent injunctive relief to prevent further injury resulting from Eddie Bauer's, Kirk's and Armstead's respective piracy of Lands' End employees and other wrongful acts as set forth herein.

### COUNT XII – COMMON LAW UNFAIR COMPETITION AGAINST EDDIE BAUER, KIRK AND ARMSTEAD

139.    Plaintiffs herein incorporate the preceding allegations of this Complaint.

140.    Eddie Bauer, Kirk and Armstead unfairly competed with Lands' End by targeting, soliciting and hiring key Lands' End sourcing, logistics and design employees who had knowledge of Lands' End's trade secrets and confidential business information, inducing those employees to breach their duties of loyalty to Lands' End and to use such trade secrets and confidential business information against Plaintiffs for the benefit of Eddie Bauer and to Lands' End's detriment.

141.    In addition to targeting and soliciting key Lands' End employees, Kirk, Armstead and other former Lands' End employees, acting in conspiracy with one another, misappropriated and disclosed trade secrets and confidential business information, which Eddie Bauer then used, and continues to use, to establish its own internal global sourcing organization and Hong Kong buying office.

142.    Kirk breached his own fiduciary duty and duty of loyalty and induced other Lands' End employees to breach their duties of loyalty to Lands' End for the benefit of Eddie Bauer and in an effort to enhance and strengthen Eddie Bauer, all to the detriment of Lands' End.

143.    Similarly, Armstead breached her own fiduciary duty and duty of loyalty owed to Lands' End for the benefit of Eddie Bauer and in an effort to enhance and strengthen Eddie Bauer, all to the detriment of Lands' End.

144.    The illegal actions of Eddie Bauer, Kirk and Armstead, independently and in the aggregate, constitute unfair competition.

145.    Eddie Bauer was a knowing beneficiary of Kirk's and Armstead's respective breaches of their fiduciary duties and duties of loyalty, misappropriation of trade secrets and confidential business information, and pirating of key employees.  Lands' End and its Affiliates spent extensive time, effort and money training key sourcing and logistics employees and developing the trade secrets and confidential business information stolen by Eddie Bauer, Kirk and Armstead.  Through the solicitation of these employees and misappropriation and use of these valuable assets, Eddie Bauer, Kirk and Armstead have gained an unfair and unlawful competitive advantage where they are saved the time, effort and expense of recruiting and developing Eddie Bauer's own global sourcing organization.

146.    Lands' End has suffered irreparable injury and damages as a result of the conduct described above.  Lands' End has no remedy at law that is as full, complete and efficient as preliminary and permanent injunctive relief to prevent further injury resulting from Eddie Bauer's, Kirk's and Armstead's respective wrongful acts as set forth herein.

## **PRAYER FOR RELIEF**

Accordingly and for the foregoing reasons, Plaintiffs Lands' End, Sears and SHMC respectfully request that this Court award them the following relief:

A.    Preliminary and permanent injunctions to restrain and enjoin Eddie Bauer, Kirk and Armstead from using or disclosing any of Plaintiffs' trade secrets and confidential business information.

B.     Compensatory damages for the misappropriation of Lands' End's trade secrets and confidential information during the period prior to imposition of an injunction.

C.     A court order directing Eddie Bauer, Kirk and Armstead to immediately remove all electronic documents and files containing any of Plaintiffs' trade secrets and/or confidential business information from any and all computers or electronic storage media in their possession, custody or control, and to return to Plaintiffs all documents, items, and copies thereof, both electronic and hard copy, containing such information.

D.     A court order requiring Eddie Bauer, Kirk and Armstead to provide proof, in the form of electronic forensic analyses, that all electronic documents and files containing any of Plaintiffs' trade secrets and/or confidential business information have been removed from any and all computers and/or electronic storage media in the possession, custody or control of Eddie Bauer, Kirk and/or Armstead.

E.     Compensatory damages, to the extent damages are calculable, including but not limited to disgorgement of Kirk's and Armstead's respective compensation during the period of their respective disloyalty to Lands' End, lost sales due to disruptions caused by Eddie Bauer's malicious behavior, costs associated with replacing improperly solicited employees, damages associated with interference with supplier and vendor relationships, and costs of Plaintiffs' investigation into Eddie Bauer's, Kirk's and Armstead's respective and collective wrongdoing.

F.     An accounting and imposition of a constructive trust upon all assets, profits and other benefits, as equity demands, received by Eddie Bauer, Kirk and/or Armstead as a result of their wrongdoing, given that Eddie Bauer has been and will continue to be operating its global sourcing and logistics organization and its Hong Kong buying office under Kirk and with the

assistance of Armstead and other improperly pirated former employees of Lands' End and its Affiliates, for the benefit of Eddie Bauer.

G.    Plaintiffs' reasonable attorneys' fees, including reasonable attorneys' fees for willful and malicious conduct pursuant to the Wisconsin Uniform Trade Secrets Act, Wis. Stat. § 134.90(4).

H.    Punitive damages for the willful and wanton, or malicious, conduct committed by Eddie Bauer, Kirk and/or Armstead, including punitive damages punitive damages in the amount of two times any award, pursuant to the Wisconsin Uniform Trade Secrets Act, Wis. Stat. § 134.90(4).

I.    Any further relief this Court deems just and appropriate.

### JURY DEMAND

Plaintiffs hereby demand a jury for all issues so triable.

Dated: August 12, 2010

/s/ John F. Gibbons
John F. Gibbons
Kevin J. O'Shea
Cameron M. Nelson
Greenberg Traurig, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Telephone: 312-456-8400
Facsimile: 312-456-8435

Terry J. Smith
Robert R. Duda Jr.
Smith O'Callaghan & White
33 North LaSalle Street
Suite 3800
Chicago, Illinois 60601
(312) 419-1000
(312) 419-1007 Fax

Attorneys for Plaintiffs
Lands' End, Inc., Sears Holdings Corporation and
Sears Holdings Management Corporation