IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| LAND'S END, INC., SEARS HOLDINGS CORPORATION, and SEARS HOLDINGS MANAGEMENT CORPORATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 10 Cv 5084 |
| v. | ) ) | JUDGE |
| EDDIE BAUER, LLC, ALAN KIRK, and SHARON ARMSTEAD, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Dated: August 12, 2010

/s/ John F. Gibbons
John F. Gibbons
Kevin J. O'Shea
Cameron M. Nelson
Greenberg Traurig, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Telephone: 312-456-8400
Facsimile: 312-456-8435

Terry J. Smith
Robert R. Duda Jr.
Smith O'Callaghan & White
33 North LaSalle Street
Suite 3800
Chicago, Illinois 60601
(312) 419-1000
(312) 419-1007 Fax

Attorneys for Plaintiffs
Lands' End, Inc., Sears Holdings Corporation and
Sears Holdings Management Corporation

i


**TABLE OF CONTENTS**

I. RELEVANT FACTUAL BACKGROUND .................................................................. 4

    A. Lands' End's Global Sourcing Organization ................................................. 4

    B. Alan Kirk's Departure and Subsequent Raiding of Employees ..................... 6

    C. Eddie Bauer's Theft of Lands' End Documents ............................................ 7

II. GENERAL STANDARDS GOVERNING PRELIMINARY INJUNCTIONS ..................... 9

III. LAND'S END HAS MORE THAN A REASONABLE LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS ........................................................................ 9

IV. PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF AN INJUNCTION IS DENIED ......................................................................................................................... 12

V. THE BALANCE OF HARDSHIPS WEIGHS DECIDEDLY IN FAVOR OF PLAINTIFFS ................................................................................................................. 14

VI. THE PUBLIC INTEREST FAVORS AN INJUNCTION .................................................. 15

VII. CONCLUSION .............................................................................................................. 15

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*APC Filtration, Inc. v. Becker,*
No. 07-CV-462, 2008 WL 3008032 (N.D. Ill. Aug. 4, 2008) .............................................. 10

*Bishops Bay Founders Group, Inc. v. Bishops Bay Apartments,*
LLC, 301 F.Supp.2d 901 (W.D.Wis. 2003) ....................................................................... 9

*Brunswick Corp. v. Jones,*
784 F.2d 271 (7th Cir. 1986) .............................................................................................. 9

*International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,*
846 F.2d 1079 (7th Cir. 1988) ............................................................................................ 9

*Jano Justice Sys., Inc. v. Burton,*
636 F. Supp. 2d 763 (C.D. Ill. 2009) ................................................................................ 13

*Kelly Servs., Inc. v. Noretto,*
495 F.*Supp.*2d 645 (E.D.Mi. 2007) ................................................................................. 11

*La Calhene, Inc. v. Spolyar,*
938 F.*Supp.* 523 (W.D. Wis. 1996) .................................................................................. 13

*Minnesota Mining & Mfg. Co. v. Pribyl,*
259 F.3d 587 (7th Cir. 2001) ...................................................................................... 10, 13

*OptionMonster Holdings, Inc. v. Tavant Tech., Inc.,*
Case No. 10-c-2792, 2010 WL 2639809 (N.D.Ill. June 29, 2010) ................................... 13

*Pepsico, Inc. v. Redmond,*
54 F.3d 1262 (7th Cir. 1995) ............................................................................................ 11

*Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.,*
149 F.3d 722 (7th Cir. 1998) .............................................................................................. 9

*Posdata Co. Ltd. v. Kim,*
No. C-07-02504, 2007 WL 1848661 (N.D. Cal. June 27, 2007) ...................................... 13

*Ty, Inc. v. Jones Group, Inc.,*
237 F.3d 891 (7th Cir. 2001) .............................................................................................. 9

**STATE CASES**

*Elm City Cheese Co., Inc. v. Federico,*
251 Conn. 59, 752 A.2d 1037 (Conn. 1999) .................................................................... 11

*Essex Group v. Southwire Co.,*
269 Ga. 553, 501 S.E.2d 501 (Ga. 1998) ..................................................................... 11, 14

Fresh out of bankruptcy, Eddie Bauer was in dire need of an internal global sourcing organization in order to improve its finances. A global sourcing organization manages a company's supply chain, and Eddie Bauer was still using an independent buying agent for that function. Rather than develop an internal global sourcing operation from the ground up, which would have taken years, Eddie Bauer decided to take Lands' Ends' highly successful, proprietary global sourcing system and organization – by poaching a large number of Lands' End employees, including Defendants Alan Kirk and Sharon Armstead, and stealing Lands' Ends' proprietary global sourcing system, in the form of procedures, forms, manuals, documents and other information. Accordingly, Lands' End seeks a preliminary injunction to stop Eddie Bauer's, Kirk's and Armstead's ongoing use and disclosure of Lands' End's misappropriated trade secrets, pursuant to Claims I (misappropriation of trade secrets) and II (civil conspiracy) of the Complaint.

Lands' End needs only to show a more than negligible chance of success on its claims for the Court to grant a preliminary injunction. That minimal threshold is more than met by the incontrovertible proof that Eddie Bauer conspired with Lands' End's own employees to steal Lands' End's proprietary trade secrets and confidential business information, and repurposed them for its own benefit.

Eddie Bauer and Kirk orchestrated a mass exodus of fourteen other key employees, including Armstead, from Lands' End's global sourcing, logistics, and design groups. These employees took with them Lands' End's proprietary vendor information, costing information, manuals, procedures, spreadsheets, and other information that, taken together, constitute essentially the entirety of Lands' End's proprietary global sourcing system. For example,

Armstead used her Lands' email account to send the following documents to her own private AOL email account before telling Lands' End that she was leaving:

- Rate File for Ocean Carriers Effective 5/1/10, containing detailed new shipping rates negotiated by Sears/Lands' End;

- Air Freight Pricing Rates for Asia for Second Quarter 2010 from Expeditors International, and comparing with rates negotiated with other carriers;

- Objectives for Logistics 2010 – blue print for Lands' End's Logistics department setting forth specific goals and Corporate Strategy-Strategy Initiatives;

- Master Data 2008 Analysis for Ocean and Dray, containing hundreds of pages of specific invoice shipping rates and data;

- Terms of Pricing on Lands' End's First Sale Program Agreement;

- Sears Ocean Contract 5-01-08 to 4-30-09 Sail Schedules;

- Information on pending Lands' End sourcing and logistics issues (as of May 11, 2010) on classification of apparel goods;

- Sears RFP for International Freight Forwarding, laying out key terms of contract and bid instructions;

- Sears Ocean Contract Discrepancy Info - Land Details, containing information on volume of shipments;

- Updated information on Sears shipping contract language; and

- 10+2 Importer Security Filing – Important Vendor Logistics Announcement.

After Armstead sent these documents to her private email account, she deleted the sent emails from her Lands' End email account and from Lands' End's computer system in an attempt to hide her improper activities.

2

Even a cursory comparison of information and documents that Eddie Bauer is using in its global sourcing system to corresponding information and documents that Lands' End uses in its system confirms Eddie Bauer's wholesale taking of Lands' End proprietary system. The Eddie Bauer documents that Plaintiffs have reviewed thus far, which Eddie Bauer made publicly available on the Internet, are almost word-for-word copies of Lands' End's documents, including typos. Moreover, the electronic metadata embedded within certain of Eddie Bauer's documents confirm that they were authored by Lands' End employees before Eddie Bauer began its campaign to take Lands' End's proprietary global sourcing system and to pirate away Lands' End's key global sourcing employees.

Lands' End will suffer irreparable harm if an injunction is not granted because Eddie Bauer, a direct competitor, has through its illegal actions gained an unfair head start in forming its own internal global sourcing system and organization, reproducing in months what took Lands' End years to build. Land's End has also lost its right not to divulge its processes and systems to anyone, particularly its competitor Eddie Bauer, regardless of price. Eddie Bauer's actions have caused and, if not enjoined, will continue to cause an intangible loss of Lands' End's competitive advantage.[1]

The balance of hardships weighs heavily in Lands' End's favor. Lands' End seeks an injunction barring Eddie Bauer, Kirk and Armstead from using Lands' End's proprietary global sourcing system to run Eddie Bauer's copy-cat global sourcing operation in competition with Lands' End, and a temporary halt to Eddie Bauer's global sourcing operation to account for the inappropriate head start that Eddie Bauer has unfairly achieved by misappropriating Lands' End's trade secrets. While this will be harmful to Eddie Bauer, it is only harmful to that

---

[1] While damages for the period prior to imposition of an injunction will likely be calculable, the full scope of damage resulting from Eddie Bauer's and Kirk's behavior will be impossible to determine.

3

advantage which Eddie Bauer improperly obtained. Moreover, Eddie Bauer will still be able to purchase goods through an independent buying agent, as it did prior to misappropriating Lands' End's trade secrets and raiding *en masse* Lands' End's key sourcing employees. Accordingly, there will be no meaningful disruption to Eddie Bauer's business.

Finally, the public interest will be served by the grant of an injunction. While competition should be encouraged, Eddie Bauer's wholesale targeting of a specific company for recruiting (as opposed to building its sourcing organization with employees from the industry as a whole), coupled with its actual theft of Lands' End's proprietary global sourcing system, in the form of its programs, processes, documents and other information (as opposed to creating its own global sourcing system) goes well beyond mere competition. Rather, this conduct reflects a calculated and improper intent on Eddie Bauer's part to steal Lands' End's proprietary global sourcing system and operation, rather than having to invest its own time and money, while at the same time causing material damage to a direct competitor by decimating its key employee ranks.

Lands' End requests that the Court enter a preliminary injunction, in accordance with the proposed order being submitted herewith.

I.  **RELEVANT FACTUAL BACKGROUND**

   A.  **Lands' End's Proprietary Global Sourcing System And Operation**

Lands' End is a leading retailer specializing in casual clothing, accessories, footwear for men, women and children, soft luggage and home furnishings. (Declaration of Hui Li, ¶ 2.[2]) Lands' End conducts business through catalog and internet sales and in retail stores throughout the United States, the United Kingdom, Germany and Japan, including Sears stores. (*Id.*) Eddie

---

[2] Plaintiffs are filing concurrently herewith a Motion for Leave to File *Instanter* the Declarations of Hui Li and Karl Dahlen, as well as all exhibits thereto.

Bauer is a direct competitor of Lands' End, also selling casual clothing throughout the United States and Canada, and through retail stores, and catalog and internet sales. (*Id.*)

Lands' End uses its proprietary global sourcing system and operation, which includes trained employees in the U.S. and Hong Kong, to manage its non-domestic supply chain. (Li Decl. ¶ 3.) The global sourcing operation's functions include development, technical design, manufacturing, and delivery of goods. (*Id.*) Lands' End's global sourcing organization also works closely with its logistics organization, which handles the shipping and freight aspects of the supply chain, as well as Lands' End's design organization, which is responsible for the creative development of products.[3] (*Id.*)

A little over four years ago, Lands' End's global sourcing organization primarily relied upon independent buying agents. (Li Decl., ¶ 4.) In 2006, Lands' End decided to develop a proprietary internal global sourcing system and organization, in order to compete more efficiently. (*Id.*) Kirk, who was Lands' End's Senior Vice President for Global Sourcing, led that effort. (*Id.*) Kirk has expertise in building global sourcing organizations, as he had done it before for his prior employer. (Declaration of Karl Dahlen, ¶ 2.) Armstead, who was Lands' End's Director of Transportation, was responsible for managing the logistics teams handling the flow of Lands' End's goods, which included responsibility for customs compliance. (*Id.* at ¶ 12.)

Over the course of the next four years, Lands' End built up its internal global sourcing system and organization with personnel both here in the United States and in a purchasing office in Hong Kong (which shares space with a Sears buying office). (Li Decl., ¶ 5.) Although Kirk had significant experience developing global sourcing systems for major retailers, it took several years for him to develop Lands' End's global sourcing system and organization into the highly-

---

[3] Within Lands' End, "Design" differs from "Technical Design" in that "Design" is a purely creative effort, whereas "Technical Design" is the refinement of the original design for manufacturability, quality, and legal compliance. (*Id.*)

5

successful operation that it is today. (*Id.* at ¶¶ 4-6.) Indeed, development of Lands' End's global sourcing system continued through 2010, with the operation producing substantial incremental cost savings each year. (*Id.* at ¶ 6.)

### B. Alan Kirk's Departure And Subsequent Raiding Of Employees

Kirk entered into an Executive Severance Agreement with Sears and its Affiliate, Lands' End in early 2009 ("Executive Agreement"). (Dahlen Decl., ¶ 4 and Exh. 1 thereto.) But at the time he signed the Executive Agreement, Kirk was already considering leaving Lands' End. Indeed, he had sold his home near Lands' End and moved into temporary housing by early 2009. (*Id.* at ¶ 3.) In October of 2009, Kirk told Lands' End that he would be joining Lands' End's direct competitor, Eddie Bauer, which had recently been sold out of bankruptcy, and that part of his compensation would be a percentage of the savings he achieved for Eddie Bauer. (*Id.* at ¶¶ 5, 8.) Kirk attempted to persuade Lands' End to allow him to take specific key employees with him, despite the non-solicitation provisions of his Executive Agreement. (*Id.* at ¶¶ 6-7.) Lands' End expressly declined to permit any exceptions to the non-solicitation provisions. (*Id.* at ¶ 7.)

Kirk did it anyway. Though the non-solicitation provisions of his Executive Agreement extended until May 6, 2010, Kirk began soliciting Lands' End's key employees, including Armstead, as early as January, 2010. (Dahlen Decl. ¶ 9 and Exh. 1, § 4(a)(v).) Kirk's and Eddie Bauer's first acquisition was John Kilmurray, the head of Lands' End's Hong Kong sourcing office. (*Id.* at ¶ 9.) By the end of July, 2010, Kirk and Eddie Bauer had poached Armstead and thirteen other key Lands' End's sourcing employees. (*Id.*) A number of these employees, including Armstead, were clearly aware of the non-solicitation provision in Kirk's Executive Agreement, in view of their repeated lies and other efforts to cover their intention to join Kirk at Eddie Bauer. (*Id.* at ¶ 11.) All of the employees who left were members of Lands' End's global sourcing, logistics, and design organizations, and while many of them denied having contact with

Kirk, Lands' End would later discover evidence of direct contact with Kirk regarding leaving Lands' End to join Eddie Bauer. (*Id.* at ¶¶ 15-16.)

### C. Eddie Bauer's, Kirk's and Armstead's Theft Of Lands' End Trade Secrets And Confidential Information

Apparently not content with the wholesale, targeted raiding of a competitor's key employees, Eddie Bauer outright stole Lands' End's global sourcing system, in the form of processes, procedures, manuals, documents, and other information that Lands' End has, over the last four years, carefully built and refined. (Dahlen Decl., ¶¶ 18-32.) Lands' End has developed particular methods of identifying and selecting potential vendors, of working with vendors to ensure legal compliance and quality control, and of managing ongoing vendor relationships. (Li Decl., ¶ 6-8.) Lands' End also has developed a large number of spreadsheets, forms, reports, and manuals that are necessary to carrying out its carefully refined process. (*Id.*) These documents and information have no meaning or use other than in the context of Lands' End's global sourcing system. (*Id.*) Lands' End maintains a password-protected vendor website, where its approved vendors can access a wide array of forms, reports, manuals and procedures that set forth what Lands' End expects and requires of its vendors. (*Id.*) These vendors are subject to written confidentiality agreements. (Dahlen Decl., ¶ 17.) In addition to those documents and forms available on a confidential basis to vendors, Lands' End also maintains a variety of other confidential information such as preferred shipping lanes and costs, and future business and organizational plans. (Li Decl., ¶ 8.)

Eddie Bauer also has a password-protected vendor website, which it created in early 2010, after obtaining the domain name in February, 2010. (WHOIS Report, Ex. A hereto.) But Eddie Bauer did not create its own global sourcing process. Rather, under the direction of Kirk, Eddie Bauer appears to have copied Lands' Ends' entire global sourcing system by stealing

7

Lands' End's procedures, processes, manuals, documents and other information, and posting them on Eddie Bauer's vendor website – after tellingly modifying the documents to appear as if they were Eddie Bauer's own documents. (Dahlen Decl., ¶¶ 18-32.) Some of these documents, such as a Standard Operating Procedure document, are so similar to the Lands' End version that it is obvious that they were copied from the Lands' End version. (*Id.*) Others of these documents contain metadata that identifies Lands' End as the author.[4] (*Id.*)

Lands' End can presently see only a narrow snapshot of what Eddie Bauer took, because Lands' End can only see limited documents which Eddie Bauer made publicly available via Google's search engine. (Dahlen Decl., ¶¶ 18-19.) But even the narrow view that Lands' End presently has confirms its worst fears because the information that Eddie Bauer made publicly available is almost identical to Lands' End's corresponding documents and information, which have no meaning or use outside the context of Lands' End's proprietary global sourcing system. Simply put, one piece of the system is not useful without the rest of the system, and Kirk, Armstead and the other former Lands' End employees now working for Eddie Bauer know it. Accordingly, expedited discovery (the subject of a co-pending motion) will uncover the full scope of Eddie Bauer's theft of Lands' End's proprietary global sourcing system.

Further, Lands' End has evidence that Eddie Bauer is in possession of more than just what is available to vendors. Defendant Sharon Armstead, a former Lands' End employee, forwarded a number of sensitive spreadsheets containing future business plans, proprietary Sears shipping rates, and relative shipping rate analyses to her personal email address before departing Lands' End to join Eddie Bauer. (Dahlen Decl., ¶ 15.) Expedited discovery will surely reveal that Eddie Bauer is using these documents, and perhaps other documents taken by other

---

[4] Lands' End would not ordinarily have access to these documents since they are on a password-protected website. However, due to a fortunate (for Lands' End) technical error, Eddie Bauer allowed some of these documents to be made publicly available as Google cache pages.

employees, to develop and operate its own internal global sourcing operation, rather than independently develop such an operation as Lands' End and other retailers have done.

## II. GENERAL STANDARDS GOVERNING PRELIMINARY INJUNCTIONS

In order to obtain a preliminary injunction, the moving party must show (1) more than a negligible chance of success on the merits of its claim, and (2) the lack of an adequate legal remedy and irreparable harm if preliminary relief is denied. *Bishops Bay Founders Group, Inc. v. Bishops Bay Apartments, LLC*, 301 F.Supp.2d 901, 906 (W.D.Wis. 2003) (citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992)). Once the moving party does this, the Court must consider (3) the balance of hardships between the plaintiffs and the defendants, adjusting the hardships for the probability of success on the merits; and (4) the public interest. *Id.* The more likely the plaintiff will succeed on the merits, the less the balance of harms must favor the plaintiff. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).

## III. LAND'S END HAS SIGNIFICANTLY MORE THAN A REASONABLE LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS

Although a plaintiff must demonstrate some probability of success on the merits to justify preliminary injunctive relief, the threshold is low. *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986). A plaintiff need only demonstrate a "better than negligible" chance of succeeding on the merits to justify a preliminary injunction. *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 726 (7th Cir. 1998); *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988). Lands' End's likelihood of succeeding on the merits of its trade secret misappropriation claims is essentially certain here – with the only real question remaining being the full scope of Eddie Bauer's, Kirk's and Armstead's misappropriation, which expedited discovery will reveal.

Lands' End has established a likelihood of success on its misappropriation of trade secrets claim, brought pursuant to Wis. Stat. § 134.90.[5] A trade secret is "information...[which] derives independent economic value, actual or potential, from not being generally known." Wis. Stat. § 134.90(1)(c). "The loss of a trade secret cannot, in some instances, be measured in monetary damages.... Oftentimes, this is because ***the greatest loss that results from a misappropriation is the loss of the right not to divulge a trade secret, regardless of price.***" *Minnesota Mining & Mfg. Co. v. Pribyl*, 259 F.3d 587, 608-09 (7th Cir. 2001) (citations omitted; emphasis added). This is particularly true where, as here, a party's trade secrets were misappropriated by, and for the benefit of, a key competitor of the party.

There is little question that Lands' End's unique, proprietary global sourcing system has economic value that is derived from not being generally known. Indeed, a number of courts have found that there is a protectable trade secret in a business system made up of multiple components. *Id.* at 595-96; *see also APC Filtration, Inc. v. Becker*, No. 07-CV-462, 2008 WL 3008032, *8-10 (N.D. Ill. Aug. 4, 2008) (granting summary judgment in favor of former employer on misappropriation of trade secret and breach of fiduciary duty claims where former employee contacted former employer's Chinese supplier for purposes of setting up agreement to supply new competing enterprise and interfered with employer's relationship with the supplier, resulting in former employer having to pay higher supply costs to another supplier). This is precisely the issue here. Lands' End protects its unique global sourcing system by requiring vendors to execute confidentiality agreements (Dahlen Decl. ¶ 17), and even then it does not disclose the entirety of its system to those vendors (Li Decl., ¶ 8).

---

[5] While Plaintiffs are pursuing numerous other claims against Eddie Bauer, Kirk and Armstead, Plaintiffs are seeking a preliminary injunction only under Counts I (misappropriation of trade secrets) and II (civil conspiracy).

The evidence that Lands' End has uncovered so far shows that Eddie Bauer copied Lands' End's global sourcing system wholesale, to the point of even copying its exact spreadsheets and forms. In similar circumstances, other courts have enjoined the same conduct that Eddie Bauer and Kirk have committed here. For example, In *Essex Group v. Southwire Co.*, 269 Ga. 553, 501 S.E.2d 501 (Ga. 1998), the Supreme Court of Georgia upheld a 5-year injunction against a former employee in the plaintiff's logistics department, who had attempted to duplicate the plaintiff's logistics system. In *Elm City Cheese Co., Inc. v. Federico*, 251 Conn. 59, 752 A.2d 1037 (Conn. 1999), the Supreme Court of Connecticut upheld a decision finding that business operations as a whole constituted a trade secret, and a three-year injunction preventing a former employee of using that trade secret. And in *Kelly Servs., Inc. v. Noretto*, 495 F.Supp.2d 645 (E.D.Mi. 2007), the district court issued a preliminary injunction against a former high-level employee preventing him from working for a competitor, where the employee was in possession of trade secrets, including operational procedures, obtained from his former employer.

Not only is Lands' End's global sourcing system a protectable trade secret, but there is substantial evidence that Eddie Bauer stole it wholesale. Eddie Bauer targeted fifteen employees of Lands' End, beginning with Kirk. Moreover, it is indisputable that Eddie Bauer posted barely-modified copies of Lands' Ends' proprietary documents on Eddie Bauer's newly-created vendor website. (Dahlen Decl, ¶¶ 18-32.) In view of these facts, there is no doubt that Lands' End is likely to succeed on the merits. Indeed, courts have entered preliminary injunctions in cases where only *one* employee went to a competitor and *no* documents were taken. *Pepsico, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995). In *Redmond*, a high-level executive left for a direct competitor, and because of his intimate knowledge of his former employer's business

plans, he was enjoined from taking a position with that competitor for 6 months. *Id.* at 1267. One factor the district court relied upon in *Redmond* was the former employee's dishonesty with his prior employer leading up to his resignation – not unlike the dishonesty of several employees involved in Eddie Bauer's raiding of Lands' End personnel. *Id.* The Seventh Circuit upheld the injunction in *Redmond*, under the "inevitable disclosure" doctrine, finding that the mere likelihood of misappropriation justified the preliminary injunction. *Id.* at 1271. In this case, Lands' End has shown more than a likelihood that trade secret information will be disclosed – the focused, targeted recruitment of fifteen employees, and the actual theft of Lands' End trade secrets and confidential information is far more damning evidence than was shown in *Redmond*.

Thus, because Land's End has direct evidence that Eddie Bauer is using Lands' End's own documents on its vendor website, and because further, expedited discovery will certainly reveal even more of Lands' End's and Sears' confidential information that Eddie Bauer has stolen and is using to develop its own global sourcing system and operation to better compete with Lands' End, despite the fact that Lands' End maintains this information on a secure website, Lands' End and Sears are likely to prevail on their claim for misappropriation of trade secrets.

IV.  **LANDS' END WILL SUFFER IRREPARABLE HARM IF AN INJUNCTION IS DENIED**

No amount of money damages can repair the damage that has resulted from, and is continuing to result from, Eddie Bauer's, Kirk's and Armstead's theft of Lands' End's proprietary global sourcing system. By stealing the actual underlying processes, procedures, manuals, documents, and other information that together make up Lands' End's unique global sourcing system, which Lands' End spent several years and millions of dollars developing, assembling and refining, Eddie Bauer, Kirk and Armstead have been able to get Eddie Bauer's global sourcing organization up and running in a matter of months, as compared to the four years

Kirk needed to do the same at Lands' End. The substantial cost savings that Eddie Bauer has already realized, and will continue to realize, from the theft and use of Lands' End's proprietary global sourcing system will enable Eddie Bauer to compete unfairly with Lands' End.

The Seventh Circuit has concluded that injunctions against use of stolen information are appropriate, even where some amount of damages is calculable. *Pribyl*, 259 F.3d at 607-608 ("payment of monetary damages should have no impact on the court's decision to grant a permanent injunction against use."). Therefore, the fact that some portion of Lands' End's damages may be calculable is simply not relevant to whether an injunction should be entered.

Moreover, courts frequently recognize the irreparable harm inherent in trade secret cases such as this one. *OptionMonster Holdings, Inc. v. Tavant Tech., Inc.*, Case No. 10-c-2792, 2010 WL 2639809, *9 (N.D.Ill. June 29, 2010) (applying rebuttable presumption of irreparable harm) (*citing UTStarcom, INc. v. Starent Networks, Corp.*, 675 F.Supp.2d 85, 864 (N.D.Ill. 2009)); *see also Jano Justice Sys., Inc. v. Burton*, 636 F. Supp. 2d 763 (C.D. Ill. 2009)) (holding that plaintiff's former employee's use of trade secrets helped defendant gain a competitive advantage over plaintiff, thereby demonstrating irreparable harm); *La Calhene, Inc. v. Spolyar*, 938 F.Supp. 523, 531 (W.D. Wis. 1996) (noting that plaintiff's loss of trade secrets resulting from former employee's misappropriation was likely to cause irreparable harm because "the boost that acquisition of [the trade secrets] will give to [defendant's current employer] is irretrievable.").

Moreover, irreparable harm is more likely where, as here, the trade secret at issue took considerable company resources (both time and money) to develop. *Posdata Co. Ltd. v. Kim*, No. C-07-02504, 2007 WL 1848661, at *8 (N.D. Cal. June 27, 2007) (holding that irreparable harm was likely where plaintiff's former employee misappropriated trade secrets relating to technology developed over a long period of time at significant cost to plaintiff for use in

employee's new, competing enterprise); *Essex Group, Inc. v. Southwire Co.*, 501 S.E.2d 501, 502, 506 (Ga. 1998) (implicitly recognizing that plaintiff was irreparably harmed when a former employee misappropriated trade secrets relating to plaintiff's logistics system (which cost two million dollars to develop over a three year period) by affirming trial court's decision to enjoin the former employee from working in the defendant's logistics department for 5 years).

Eddie Bauer, Kirk and Armstead are using Lands' End's own personnel, and its own proprietary global sourcing system, to unfairly compete directly with Lands' End, and to accomplish in only a few months what would otherwise have taken years to accomplish. The additional competitive opportunities that Eddie Bauer will realize through this improperly-obtained advantage cannot be measured by money damages alone – the harm is irreparable. The only way to effectively stop this harm, as the courts have recognized, is to issue an injunction that will eliminate the "head start" that Eddie Bauer has acquired by misappropriating Lands' End's trade secrets and other confidential business information.

## V. THE BALANCE OF HARDSHIPS WEIGHS DECIDEDLY IN LANDS' END'S FAVOR

The preliminary injunction Lands' End seeks imposes some hardship on Eddie Bauer, but any such hardship is necessary to deprive Eddie Bauer of its ill-gotten gains.[6] Lands' End seeks an order barring Eddie Bauer from all use of Lands' End's proprietary global sourcing system, including specifically all relevant procedures, processes, manuals, documents, forms, information, and other materials taken by former Lands' End employees, including Kirk and Armstead, and provided to Eddie Bauer for its use and benefit. Lands' End further seeks an order halting all operations associated with Eddie Bauer's global sourcing organization for a period, to be determined after expedited discovery and at the preliminary injunction hearing, that

---

[6] Lands' End is also seeking expedited discovery, and may modify the terms of the requested injunction upon discovery of new or additional information.

14

reflects the amount of time it would have taken Eddie Bauer to independently develop its own internal global sourcing organization. Significantly, this injunction will *not* prevent Eddie Bauer from continuing its business; it may continue to use an independent buying agent, which is how it operated its global sourcing operation before it stole Lands' End's and Sears' trade secrets.

## VI. THE PUBLIC INTEREST FAVORS AN INJUNCTION

The public interest favors swift and immediate entry of an injunction. While the public interest favors competition, what Eddie Bauer, Kirk and Armstead have done is not competition; it is theft. Kirk and Armstead are clearly free to use their expertise in global sourcing to legitimately build a proprietary global sourcing organization for Eddie Bauer, just as they did for Lands' End. Indeed, Lands' End generously and explicitly waived Kirk's non-compete provisions so that he could do so. Lands' End had no reason to believe Kirk, or Armstead for that matter, would attempt to duplicate Lands' End's system at Eddie Bauer, or that they would direct the mass copying of Lands' End's processes, procedures, manuals, forms, documents and other information. Lands' End had every reason to believe that Kirk and Armstead would in fact build a new global sourcing organization for Eddie Bauer from scratch; indeed, Kirk stated to Lands' End that he felt he had done everything he could do for Lands' End and wanted to move on to a new challenge. Unfortunately, Kirk did not take on a new challenge. Instead, he and Armstead took Lands' End's proprietary global sourcing system and operation, including key employees, and offered it to Eddie Bauer as a turnkey operation. Rather than engage in competition, Kirk and Eddie Bauer are simply stealing. The public interest favors competition – not theft – and the relief Lands' End seeks will restore genuine competition.

## VII. CONCLUSION

As set forth hereinabove, there can be no question that Defendants have willfully stolen Lands' End's proprietary global sourcing system, and other trade secrets. Accordingly, Lands'

15

End respectfully requests that this Court grant a preliminary injunction in the form of the [Proposed] Order being submitted herewith.

<div align="center">*   *   *</div>

Dated: August 12, 2010

/s/ John F. Gibbons
John F. Gibbons
Kevin J. O'Shea
Cameron M. Nelson
Greenberg Traurig, LLP
77 West Wacker Drive, Suite 3100
Chicago, IL 60601
Telephone: 312-456-8400
Facsimile: 312-456-8435

Terry J. Smith
Robert R. Duda Jr.
Smith O'Callaghan & White
33 North LaSalle Street
Suite 3800
Chicago, Illinois 60601
(312) 419-1000
(312) 419-1007 Fax

Attorneys for Plaintiffs
Lands' End, Inc., Sears Holdings Corporation and
Sears Holdings Management Corporation